Louis A. Valente, J.
Plaintiffs are former employees of the Interborough Rapid Transit System, having been connected with its operating and maintenance divisions. While in its employ they joined the Transport Workers Union of Greater New York, of which defendants are now officers. In June, 1940, the City of New York acquired the Interborough and plaintiffs then became city employees and were classified in its civil *481 service. The Transport Workers Union had previously entered into a contract with the Interborough relating to the wages and working conditions of its employees, which contract, on April 3, 1940, was assumed by the Board of Transportation of the City of New York on the date of the consummation of transit unification. Thereafter, and at various times during 1940 and 1941, plaintiffs resigned from membership in the union and severed their association with it. Obviously, the reason for plaintiffs disassociating themselves from the union is that they no longer required its intercession or protection, for as civil service employees they have obtained a security of position and other satisfactory related benefits, which make union membership unnecessary. As a further reason for their resignation, plaintiffs aver that the officers of the union “ have been closely associated with the communistic movement in the City of New York ” and they do not wish to aid such a cause; and that as a consequence of their withdrawal the defendants and their agents have picketed the homes of the plaintiffs and have distributed leaflets or circulars concerning some of the plaintiffs, charging that after the defendants had secured certain benefits for the plaintiffs they are now undermining the union by lapsing their membership. Plaintiffs also allege that they were subject to other embarrassment and annoyance to themselves and the members of their families, which do not require a detailed recital here. Suffice it to say that they are typical of controversies of this kind.
The facts for the most part are not challenged by the defendants. In fact, they admit the picketing and the distribution of the circulars. Factually there seems to be little at issue. The defendants claim that as a union they have the right to engage in the activities to which the plaintiffs object. Plaintiffs have now applied for a temporary injunction to restrain the defendants, their agents and members from interfering with the plaintiffs in the enjoyment of their civil rights and from picketing their homes and otherwise harassing and annoying them and their families. In addition to their reliance upon their asserted right to continue the practices claimed to be objectionable, defendants maintain that the court must deny the motion and dismiss the complaint, for this is a labor dispute, and therefore the court lacks jurisdiction to grant a temporary injunction without a showing on the part of the plaintiffs of a compliance with the conditions precedent prescribed by section 876-a of the Civil Practice Act (L. 1935, ch. 477). This is commonly known as the anti-injunction act, and was enacted for the purpose of eliminating what many considered abuses in the *482 granting of injunctions in labor cases. These and similar acts are for the most part patterned after the Norris-La Guardia Anti-Injunction Act (U. S. Code, tit. 29, § 101 et seq.) and prevent the granting of injunctions in cases growing out of labor disputes on ex parte applications or simply on affidavits. Most of the State acts essentially follow the Federal act. Section 876-a of the Civil Practice Act provides that no temporary or permanent injunction shall issue in any case involving or growing out of a “ labor dispute ” except after an observance of certain procedural requirements including a hearing.
The term “ labor dispute ” includes any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiations, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the relation of employer and employee.
A difficulty not uncommon in these cases is in determining what constitutes a labor dispute. The United States Supreme Court and the Court of Appeals of the State of New York have dealt with it comparatively recently. (Lauf v. E. G. Shinner & Co., 303 U. S. 323; New Negro Alliance v. Grocery Co., 303 U. S. 552; Baillis v. Fuchs, 283 N. Y. 133; May’s Furs & Ready-To-Wear v. Bauer, 282 N. Y. 331.) The trend of these decisions seems to indicate that the statute should receive a literal .construction. In the Baillis case (supra, p. 136) the Court, of Appeals, Seaks, J., declared: “ The question of what constitutes a ‘ labor dispute,’ even under the statutory definition, admits of no generally applicable and definitive answer. Of necessity, the answer must depend upon the circumstances in the individual case.”
The United States Supreme Court in New Negro Alliance v. Grocery Co. (supra) held that a labor dispute retained its character as such if it involved any question referring to any of the terms and conditions of employment or that might involve the betterment of any terms or conditions. The existence of a labor dispute is not negative by the fact that the plaintiffs and defendants do not stand in the relation of employer and employee or by the fact that the employees are altogether satisfied with the conditions of their employment. (May’s Furs & Ready-To-Wear v. Bauer, supra; Lauf v. E. G. Shinner & Co., supra; New Negro Alliance v. Grocery Co., supra; Blankenship v. Kurfman, 96 F. 2d 450; Strauss v. Steiner, 173 Misc. 521; Fairfield Bar & Restaurant v. Friedman, 172 Misc. 146.)
*483 The Court of Appeals in May’s Furs & Ready-To-Wear v. Bauer (supra, p. 339) stated: “ In explicit terms, the statute provides that if the other requisites are present, then a labor dispute shall be found to exist 1 regardless of whether or not the disputants stand in the relation of employer and employee.’ (Subd. 10-c.) It is indisputably clear that the existence or non-existence of the employer-employee relation cannot be the factor by which to determine the presence or absence of a labor dispute.”
This agrees with the interpretation given the Norris-La Guardia Act in the United States Supreme Court in Lauf v. E. G. Shinner & Co. (supra) and New Negro Alliance v. Grocery Co (supra), as well as Blankenship v. Kurfman (supra). Inasmuch as the employer-employee relationship is not the factor determining the presence or absence of a labor dispute, the Court of Appeals in May’s Furs & Ready-To-Wear v. Bauer (supra, p. 339) stated: “ Other questions of fact, therefore, must constitute the crucial test. The statute supplies two relevant criteria. First, the dispute, in order to be a labor dispute, must be one which relates to ‘ conditions of employment * * * or representation of persons in negotiating * * * conditions of employment * * (Subd. 10-c.) Second, the disputants must be connected with the same industry, etc. (Subd. 10-a, subd. 10-b.) ”
Paragraph (e) of subdivision 10, in defining the term “ labor dispute ”, makes it inclusive of any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employees, regardless of whether or not the disputants stand in the relation of employer and employee. While the disputants here do not stand in the relation of employer and employee, they are engaged in the same industry, and the controversy concerns their association or representation and the maintenance of the terms or conditions of their employment. Applying the rule laid down in the most recent cases, and using the precise language of the statute as a gauge to determine whether the controversy here presents a labor dispute, inevitably leads to the opinion that this controversy if it affected a private industry falls squarely within the definition of the term ‘ ‘ labor dispute ’ ’.
The Federal, as well as the courts of this State, have held that a labor dispute could exist within the statute where *484 employees were nonunionists, were not on a strike and were wholly satisfied with their working conditions and did not desire union affiliation. (Lauf v. E. G. Shinner & Co., supra; May’s Furs & Ready-To-Wear v. Bauer, supra; Strauss v. Steiner, supra; Fairfield Bar & Restaurant v. Friedman, 172 Misc. 146; Exchange Bakery & Restaurant v. Rifkin, 245 N. Y. 260.) If then a labor dispute exists where a labor union seeks to impose its claimed benefits upon workers who are not identified with it and do not wish to be identified with it, may it not, within the law, seek to persuade these plaintiffs to retain their membership in the union? Ordinarily the query would admit of only one answer. If the union may exercise the right of persuasion in instances where workers have never been members of the union, it would follow as a logical corollary that it would have a similar right in cases of members who have resigned or are contemplating doing so. The court would therefore be obliged to find that unless employees of the State or a subdivision are excluded from the operation of section 876-a this is a labor dispute and the prerequisites of section 876-a must be complied with before the plaintiffs could be granted relief.
If the plaintiffs were now working for a private corporation it would be unnecessary to say more, but since the plaintiffs as well as the members of the union are employed by the city, it is imperative to ascertain whether section 876-a applies to them. Section 715 of the Labor Law (added by L. 1937, ch. 443, § 1, eff. July 1, 1937), referring to the provisions of the New York State Labor Relations Act, is as follows: . “ The provisions of this article shall not apply to the employees of any employer who concedes to and agrees with the board that such employees are subject to and protected by the provisions of the national labor relations act or the federal railway labor act or to employees of the state or of any political or civil subdivision or other agency thereof, or to employees of charitable, educational or religious associations or corporations.” That the employees of the city are employees of a political subdivision of the State cannot be questioned. This section likewise excludes State employees because they are responsible to the People of the State and are given in other provisions of the law adequate safeguards, in view of the provision of section 700 declaring the policy of the article. (White v. Boland, 254 App. Div. 356.)
Although section 876-a and the State Labor Relations Act were passed at different sessions of the Legislature, they are in “ pari materia,” and should be read together and reconciled *485 so far as possible. (Civ. Prac. Act, § 876-a, added by L. 1935, ch. 477; Labor Law, § 700 et seq., added by L. 1937, ch. 443; Jewish Hosp. of Brooklyn v. Doe, 252 App. Div. 581.)
That section 876-a and the New York State Labor Relations Act must be considered conjunctively is further evidenced by the fact that the term “ labor dispute ” as defined in subdivision 8 of section 701, is strikingly similar to the definition used in section 876-a. Other illustrations of their relationship could be given, but section 715 exempting employees of the State or of any political subdivision or other agency thereof from the operation of the article is persuasive and controlling.
In the case of Jewish Hosp. of Brooklyn v. Doe (supra) the Appellate Division, Second Department, in a learned opinion by Justice Johnston, held that a statute prescribing in general terms procedural requirements is not applicable to the State or its political subdivisions unless such entities are specifically included in the statute. (Citing Bush Term. Co. v. City of New York, 259 N. Y. 509; Davidson v. City of New York, 221 N. Y. 487; Uvalde Asphalt Paving Co. v. City of New York, 149 App. Div. 491.) In that case, the Appellate Division, Second Department, held that a charitable hospital, to the extent that it cared for free patients sent to it by the city, and being partially reimbursed by the city, was in fact a governmental agency performing a governmental function so as to be excluded from operation of the statute prohibiting injunction without hearing in cases of labor disputes. The court there pointed out that in passing section 876-a the Legislature had in mind industrial and commercial enterprises, since conflict has always been present in such enterprises. Justice Johnston also observed (p. 584): “ It is an ancient rule that general words in a statute neither include nor bind the government by whose authority it was enacted ‘ where its sovereignty, rights, prerogatives or interests are involved.’ (Denton v. State of New York, 72 App. Div. 248, 251.) ”
The objects of section 876-a and the State Labor Relations Law are similar. They should be reconciled in an endeavor to ascertain the intent of the Legislature. (Matthews v. Matthews, 240 N. Y. 28; Matter of Farrell v. Board of Health of City of Oswego, 243 App. Div. 332.) Section 715 of the Labor Relations Act “ unlike the instant statute — expressly provides it shall not apply ‘ to employees of the State or of any political or civil subdivision or other agency thereof * * * ’ ”. (Jewish Hosp. of Brooklyn v. Doe, supra, p. 586.) As was pointed out in the Jewish Hospital case, (supra, p. 586) this exemption “is merely declaratory of previously known and *486 existing public policy, that the groups enumerated fall without the scope of such legislation unless specifically included therein.” Moreover, in the interpretation of a statute it cannot be presumed that the Legislature intended unwise or injurious results to flow from its action, and where one construction would result in mischievous or disastrous consequences a more fortunate construction must be sought. (Hayden v. Pierce, 144 N. Y. 512; Matter of Washington St. Asylum & Park R. R. Co., 115 N. Y. 442.) The hardship and inconvenience to which the public would be subjected if section 876-a and its incidental requirements had to be observed cannot be overlooked.
Finally, in section 700 of the Labor Law, defining the policy of that enactment, it is declared: ‘ ‘ This article shall be deemed an exercise of the police power of the state for the protection of the public welfare, prosperity, health and peace of the people of the state.”
For these reasons the plaintiffs are relieved of compliance with the provisions of section 876-a.
The implication is clear from the principal affidavit submitted by the defendants, as well as from the memorandum submitted by their counsel, that the union is of the belief that it may demand the discharge of the plaintiffs who are no longer members of the union and do not wish to be affiliated with it. If the union were possessed of this power, it could establish a “ closed shop.” In such event employment in the city service would be dependent upon membership in the union, which would be the vital consideration, the provisions of the Constitution of the State of New York and the Civil Service Law to the contrary notwithstanding. Section 6 of article V of the Constitution relating to civil service appointments and promotions, declares : “Appointments and promotions in the civil service of the state, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive * * *. Laws shall be made to provide for the enforcement of this section.” The Civil Service Law was enacted to carry into effect this article of the Constitution, which has as its underlying principle the desire to afford everyone who has the necessary qualifications an equal opportunity of securing appointment. (Matter of Mendelson v. Finegan, 168 Misc. 102, affd. 253 App. Div. 709.) Section 8 of the Civil Service Law provides: “No officer or officers having the power of appointment or employment shall select or appoint any person for appointment, employment, promotion or reinstatement except in accordance with the pro *487 visions of this chapter under the rules and regulations prescribed thereunder.” Section 6 of the Civil Service Law provides: “ The state civil service commission shall * * * Prescribe * * * suitable rules and regulations for carrying into effect the provisions of this chapter and of section six of article five of the constitution of the state of New York, as herein provided. The rules prescribed by the state and municipal commissions pursuant to the provisions of this chapter shall have the force and effect of law.” Subdivision 5 of section 11 of the Civil Service Law substantially grants the same power to the municipal commission of each city, and in subdivision 1 1 ‘ The mayor or other duly authorized appointing authority of each city in this state shall appoint and employ three suitable persons to prescribe, amend and enforce rules for the classification of the offices, places and employments in the classified service of said city, and for appointments and promotions therein and examinations therefor
Obviously appointments and promotions in the Civil Service must be determined upon merit and fitness, under suitable regulations adopted by commissions created by the Civil Service Law under the mandate of the Constitution. The right to appointment depends upon merit and fitness, not upon membership in a labor organization. Inasmuch as plaintiffs have acquired civil service status, they may be removed only for causes recognized by law (§ 22, subd. 2) and not for their failure to resume union membership.
Coneededly, the purpose of the picketing is to coerce the plaintiffs into retaining or resuming union membership and thus effect the creation or maintenance of a closed shop. The purpose of picketing is the ultimate object thereof, such as to obtain higher wages, or less hours of employment, or the closed shop. (1 Teller on Labor Disputes and Collective Bargaining, § 109.) Of necessity the initial step is union affiliation, which is followed by a demand for the closed shop. The theory of the maintenance of a “closed shop ” by a municipality being repugnant to the Constitution, which prescribes standards other than union membership for the selection of Civil Service employees, the observations in Williams v. Quill (277 N. Y. 1) that a labor union may call a strike and picket premises of an employer with the intent of inducing him to employ only union labor, are therefore not decisive of the instant controversy.
It seems to be well settled, and the courts have generally acknowledged, the right of the employee to picket peacefully. In Senn v. Tile Layers Protective Union (301 U. S. 468) the United States Supreme Court held that peaceful picketing did *488 not require statutory sanction but was a right granted by the Constitution, subject, of course, to the right of the State to regulate the methods and means of publicity, as well as the use of the public streets. (Exchange Bakery & Restaurant v. Rifkin, 245 N. Y. 260, supra.) So, too, picketing without a strike is no more unlawful than a strike without picketing. The rationale of those cases which permit picketing in the absence of a strike is set forth in that case. The test to be applied is whether the end and the means are lawful. As Judge Andrews pointed out in Exchange Bakery & Restaurant v. Rifkin (supra, p. 262): “As always, what is done, if legal, must be to effect some lawful result by lawful means ”. There is nothing inherently illegal in picketing for the purpose of inducing an employer to employ only union labor. (National Protective Assn. of Steam Fitters & Helpers v. Cumming, 170 N. Y. 315.) This, however, would presuppose a situation where the employer is free to contract with such union, regardless of restrictions imposed either by the Constitution or statute. The city is not at liberty to act in derogation of the provisions of the Constitution or the Civil Service Law, and picketing that has for its ultimate object establishment of a “ closed shop ” wherein only those shall be employed who are members of the union cannot be viewed as legal. In Exchange Bakery & Restaurant v. Rifkin (supra, pp. 262-263) Judge Andrews said: “A combination to strike or to picket an employer’s factory to the end of coercing him to commit a crime, or pay a stale or disputed claim would be unlawful in itself * * * Likewise a combination to effect many other results would be wrongful. Among them would be one to strike or picket a factory where the intent to injure rests solely on malice or ill will. Another’s business may not be so injured or ruined. It may be attacked only to attain some purpose in the eye of the law thought sufficient to justify the harm that may be done to others.”
The concluding aspect of the matter relates to the picketing of the homes of the plaintiffs. The enjoining of picketing of houses of employees had judicial approval by the Appellate Division and the Court of Appeals in two cases decided within the past few years. In Busch Jewelry Co. v. United Retail Employees’ Union (168 Misc. 224, affd. 255 App. Div. 970, affd. 281 N. Y. 150) all picketing was enjoined in an action by an employer operating retail stores in New York City to restrain striking employees. In Remington Rand v. Crofoot (248 App. Div. 356, affd. 279 N. Y. 635) the Appellate Division and the Court of Appeals upheld an order of Special Term which enjoined striking employees, among other acts, from “picket *489 ing homes.” In Remington Rand v. Crofoot (supra, p. 360) it was said that section 876-a of the Civil Practice Act and similar statutes ‘ ‘ deal in the main with practice and procedure; they are declaratory of the existing law and do not render lawful any act which was unlawful when the statutes were passed.”
Teller, in his text “ Labor Disputes and Collective Bargaining,” states in section 115 of volume 1 that picketing the residence of an employee has generally been held illegal, but sometimes lawful, whereas picketing the residence of the employer has uniformly been held illegal. Proceeding in support of the foregoing statement, the same authority states (p. 352): “In State v. Zanker (179 Minn. 355) striking pickets were convicted of disorderly conduct for bannering an employee who refused to join the strike as a 1 strikebreaker ’ and picketing with such banners before her home. In State v. Perry (196 Minn. 481) a later Minnesota case, the Zanker case was cited with approval, the court adding:1 Defendants were endeavoring to carry into the home and domestic life of Gustafson (the complainant) an industrial controversy which should have been left elsewhere. ’ ” Likewise, the same authority (p. 352) refers to the case of State v. Cooper (205 Minn. 333) holding that picketing of the home of an employee was illegal, wherein the court, quoting from Anderson v. Ueland (197 Minn. 518) stated that: “ ‘ the home is a sacred place for people to go and be quiet and at rest and not be bothered with the turmoil of industry, and that as such it is a sanctuary of the individual and should not be interefered with by industrial disputes.’ ”
Moreover, in some jurisdictions, statutes have been enacted declaring the picketing of the domicile of an employee by other employees to be an unfair labor practice or unlawful. (Wisconsin State Labor Lelations Law, Employment Peace Act, L. 1939, ch. 57, § 111.06, subd. [2], par. [a]; Nebraska Comp. Stats, of 1929, § 28-813; English Trades Disputes and Trade Unions Act of 1927, 17 & 18 Geo. V, ch. 22.) In the case of the English Act of 1927 picketing of a residence in furtherance of a labor dispute even though peaceful was declared unlawful, the act providing that, for the purpose of inducing any person to work or to abstain from working, it should not be lawful ‘ ‘ to watch or beset a house where a person resides or the approach to such a house or place ”.
In People v. Kaye (165 Misc. 663) defendant was convicted of disorderly conduct for picketing in front of the home of an employee of Davega’s in The Bronx with a sign stating that complainant was a “ strikebreaker.”
*490 The fundamental principles laid down in Curran v. Galen (152 N. Y. 33) are still sound. In that case the Court of Appeals said (pp, 37-38): “ Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling * * * Every citizen is deeply interested in the strict maintenance of the constitutional right freely to pursue a lawful avocation, under conditions equal as to all * * * The sympathies, or the fellow-feeling which, as a social principle, underlies the association of workingmen for their common benefit, are not consistent with a purpose to oppress the individual who prefers by a single effort to gain his livelihood. If organization of workingmen is in line with good government, it is because it is intended as a legitimate instrumentality to promote the common good of its members. If it militates against the general public interest, if its powers are directed towards the repression of individual freedom, upon what principle shall it be justified? ’’ See, also, Auburn Draying Co. v. Wardwell (227 N. Y. 1).
The picketing of the homes of the plaintiffs, under the circumstances disclosed in this case, has for its ultimate object the accomplishment of an unlawful purpose and involves a malicious intent to annoy and intimidate the plaintiffs and their families.
For the reasons assigned, plaintiffs’ motion is granted restraining the defendants, their agents and servants, pendente lite, from picketing the plaintiffs’ homes and the approaches thereto, and from engaging in any acts of intimidation directed to the plaintiffs and the members of their families. Settle order.